## 35225. GEORGIA LIFE & HEALTH INS. CO. *v.* GAMMAGE.

Decided November 26, 1954.

*Turpin & Lane & Mattox, Jule B. Greene,* for plaintiff in error. *E. W. Maynard, H. T. O'Neal, Jr.,* contra.

Nichols, J. ■ In the first two special grounds of the motion for new trial, it is contended that the court erred in submitting to the jury the question of the defendant's bad faith in refusing to pay the plaintiff, because there was no evidence authorizing the jury to make such a finding. The evidence relied upon by the plaintiff to support her contention in this respect is that the defendant made two payments of between twenty and thirty dollars to Mr. Gammage during 1951, when he had an illness, and that the defendant knew Mr. Gammage had undergone brain surgery in 1949. The defendant refused payment on the

ground that the condition causing the insured's death originated in 1949, before the policy was issued.

Dr. Sam Patton testified that he and another physician diagnosed the insured's condition as an aneurism of the internal carotid artery and sent him to Atlanta for surgery in 1949. Gammage had suffered from headaches, and Dr. Patton found blood in his spinal fluid. Dr. Patton attended him before his death, and found conditions of hypertension and a stroke following the onset of a convulsion on the day before Gammage died. Dr. Patton testified: "I don't think he ever recovered completely from the condition I diagnosed the first time I saw him, because he had some damage to the muscle control of his right eye, secondary to the aneurism and the surgery which persisted, and in October, 1951, he had a blackout spell. At that time, I felt, instead of just having blackouts, it was probably an early convulsion, and he had a convulsion at the time he died. These convulsions that he had were probably secondary to his aneurism and to the surgery he had. 'Course if he hadn't had the surgery, he would have died of the aneurism long before. I think the convulsion and hypertension were all secondary or part and parcel of the disease that caused the aneurism and that the aneurism and the bleeding into the brain irritated the brain and caused the convulsion and that the hypertension was part and parcel of the same disease. It was a cardio-vascular disease, or disease of the vessel. I would say that it is my professional opinion that the cause of his death resulted from this condition which arose back in 1949, or at least as far back as the first time I saw him, on July 3, 1949. He had a marked impairment of vision of his right eye and an external squint or deviation of the right eye at that time. That condition lasted for a long period of time. I saw him in July, 1950, and he still had that eye defect. This eye defect caused or was a result of this condition for which I first diagnosed him in 1949." He further testified: "I believe the cause of Mr. Gammage's death and the diagnosis, the trouble that I saw in 1949, were directly connected."

This evidence was sufficient to have authorized a finding that the death of the insured resulted from sickness or disease originating before the policy was issued, and so was not covered by the policy. That the insurance company had previously paid

claims of the insured for sickness does not show bad faith, as it was not shown that these illnesses were connected with the cardio-vascular disease first observed in 1949. The fact that the defendant knew of this previous condition of the insured does not effect liability under the terms of the policy for the death resulting, as the policy covered only death resulting from illness originating after the date of issue. *Liberty National Life Ins. Co.* v. *Parrimore*, 68 *Ga. App.* 623 (23 S. E. 2d 541). The defendant's knowledge of the insured's condition might have shown its waiver of a representation or warranty of good health at the time the policy was issued, but the policy did not contain any such representation or warranty by the insured.

It appeared that the defendant's refusal to pay was justified and was not frivolous or unfounded, as the jury could have found that the fatal disease originated before the ·policy was issued, and that the death resulting was not covered. The evidence did not raise an issue as to the defendant's bad faith in refusing to pay the claim, and the court erred in submitting this issue to the jury. *Southern Ins. Co.* v. *Ray*, 40 *Ga. App.* 262 (149 S. E. 304); *Guaranty Life Ins. Co.* v. *Martin*, 44 *Ga. App.* 545 (162 S. E. 288); *Life & Casualty Ins. Co. of Tenn.* v. *Freemon*, 80 *Ga. App.* 443, 444 (56 S. E. 2d 303).

■ The third special ground complains of the following charge to the jury: "I charge you that if the insured enjoyed such health and strength as to justify the reasonable belief that he was free from derangement of organic functions or free from symptoms calculated to cause reasonable apprehensions·of such derangement and to ordinary observation and to outward appearance his health is such that he may, with ordinary safety, be insured and upon ordinary terms, the requirement of good health is satisfied. Good health is a relative term and does not mean absolute freedom from physical infirmity but only such a condition of body and mind as that one may discharge the ordinary duties of life without serious strain upon the vital powers. A policy applied for and accepted in good faith cannot be voided by proof that the malady which ultimately occasioned the death or sickness must have existed in some incipient form prior to the issuance of the policy, but unknowingly and without at that time manifesting any symptoms or effect or in any way causing

reasonable apprehension of any impairment or derangement of the system, even though by acceptance of the contract the insured may have warranted himself to be in good health." It is said that these principles were inapplicable, under the terms of the policy sued on, to the facts of the case, in that the existence of even an incipient and unknown disease before the policy was issued would bar recovery on the policy for death resulting from such disease, regardless of what the insured believed regarding his health at the time of issue. It is contended that the charge tended to make it appear to the jury that the insured's belief as to his health when the policy was issued was a material fact.

There was no requirement or warranty of good health in the policy sued on, but error is not assigned on the charge in this respect. We note also that the charge does not mention the insured's personal belief as to his good health. The good health of the insured at the time the policy was issued was relevant to the question of whether the disease resulting in his death originated before or after the date of the policy. The issue may be stated as being whether or not the insured was afflicted with the fatal disease when the policy was issued, or as being whether the fatal disease originated before or after the issue date. We see no material difference. The charge here complained of submitted the issue in the first form.

Under the facts of the present case, it was unquestioned that the insured suffered an aneurism of the internal carotid artery, leading to his brain, within the year previous to the date of the policy; that he then had symptoms of headache and blood in his spinal fluid, and that the aneurism was removed by surgery. While the aneurism of the artery was removed, the cardio-vascular disease producing the aneurism may have continued until the policy was issued and then until the insured died. This was the purport of Dr. Patton's opinion, as set out in the first division of this opinion. Mrs. Gammage testified that, in 1950, her husband was in good health, free of disease, and as well as ever he had been, and was making no complaints to her. If at that time he showed no observable symptoms, the jury were authorized to find, as they did, that the disease resulting in his death originated after the policy was issued, and so was covered.

As said in *National Life & Accident Ins. Co.* v. *Martin*, 35

*Ga. App.* 1, 4 (132 S. E. 120) : "The cause or causes of death are ofttimes as subtle and obscure as any fact which relates to the life of man. . It is rarely as simple a proposition as the verdict of a coroner's inquest. Rather is it true, as some philosopher has said, that all life carries within itself the germ of its own dissolution,—that to live is to begin to die." To permit the insurer to defeat recovery by showing that a death was not insured because it resulted from what was, when the policy was issued, an incipient and unknown disease, although it may have "originated" in a technical sense at some time previous to the date of the policy, would be to allow the insurer to frustrate the bona fide expectations of the insured, who, having reason to believe that he was free of disease when the policy was issued, would expect that any disease causing his death would be one originating later and so within the coverage of the policy. The insurer in the present case, although contending for such a construction of its policy, sought to prove that the disease "originated," in the sense that it was known and manifest to the insured, before the policy was issued, and submitted medical opinion that the disease continued and resulted in the insured's death. However, the jury was authorized to believe that the insured had recovered from such disease because he was in good health when the policy was issued. The charge complained of permitted the jury so to find, and was applicable to the facts of the case. It did not permit the jury to find for the plaintiff even though the disease had originated, or become known and manifest in its symptoms, before the policy was issued.

█ In support of the general grounds of its motion, the defendant contends only that the evidence was insufficient to show bad faith on its part, and this contention must be sustained, as indicated in the first division of this opinion. On condition that the amounts awarded for damages and attorney's fees be written off within ten days after the remittitur is received, the judgment is affirmed, otherwise reversed.

*Judgment affirmed on condition. Townsend, Carlisle, and Quillian, JJ., concur. Felton, C. J., and Gardner, P. J., dissent.*

FELTON, C. J., dissenting. I think that the charge treated in division 2 of the majority opinion was erroneous. In the absence of a statutory prohibition, such a contract of insurance as in this

case is lawful if no reason appears why it is contrary to public policy. 29 Am. Jur. 184, § 166, note 7; *Liberty National Life Ins. Co. v. Parrimore,* 68 *Ga. App.* 623. The subject matter of the charge was foreign to any issue in the case and was misleading and confusing. Under such a policy the appearance of the insured is immaterial, and such a policy cannot be said in any and every event to insure against a malady or disease which existed in an incipient form prior to the issuance of the policy, when there are no manifest symptoms or reasonable apprehension of impairment of the system. This type of policy, issued for small amounts and for small premiums, may be most advantageous for those who could not secure ordinary policies either because of physical or financial conditions. The effect of such a charge, if applied, is to change the terms of the contract. Gardner, P. J., concurs in this dissent.